The Honorable Judges of the United States Court of Appeals for the Third Circuit. Oyez, oyez. All persons having business with the Honorable United States Court of Appeals for the Third Circuit are admonished to draw near and give their attention. The discord is now in session. God save the United States and this Honorable Court. Before we start, or as part of our starting, we would like to acknowledge with appreciation the presence of Judge Anne Thompson of the United States District Court for the District of New Jersey. This court does not have all of its vacancies filled and therefore we have to ask for the help of visiting judges and in particular most of the senior judges, district judges of this circuit. Judge Thompson, who used to be the Chief Judge of the District of New Jersey, has kindly consented to sit with us so the court and especially Judge Ambrose and I are particularly grateful. So thank you Anne and welcome. Certainly welcome. And now we, I spoke for both of us, I thought. Good. Well we'll see. If you'll give me your vote, sure. Okay. Let's see, Ms. Kay has asked for permission to use an exhibit at oral argument. Yes, Your Honor, and I have brought additional copies. Is it a big thing? No, it's just a one page. Oh. I wasn't going to do that, but I have it. Okay, wait a minute. Before we do anything else, let's work it this way. Say who you are and then you can make the oral motion. Thank you, Your Honor. Good morning. May it please the court, my name is Elizabeth Hay and I am here on behalf of the appellant, Johnny Corley. And I would first ask if I could reserve three minutes of my rebuttal time. That's my intent. I was also going to request that I would address an oral argument, just the first issue, the suppression issue, unless the court has questions on the other two issues that were briefed. Okay. And then I would request, as Judge Slover mentioned, I did file a motion yesterday to use an exhibit and I have copies of that one page. It's just simply a demonstrative timeline and I'll hand that up with the court's permission. Ms. Mann, do you have any objection? No objection. Okay, thank you. Don't, don't, okay. Here's yours. Great, thank you. I will orally grant permission so I don't have to sign the order. Thank you, Your Honor. No, I'm sorry. Usually when I ask for it, it's a great big deal. Well, we can zero it. Actually, we can just give one to Bill. I have two additional. Okay, that would be great. Just give one. Well, you have one in your motion. Oh, I didn't know that. Oh, me? I didn't know that. Now I get it. Okay, I'll take it.  Abe, do you want this? Okay, give it to Abe. Excuse me. Oh. I handed one additional today. Yeah, I heard. Yeah. Does another law clerk want one from another chambers? No. Oh, okay. Well, yeah. Well, for my chambers, it's Abe's. I guess. Okay. All right, you may now start. Doesn't it start our time now? Yeah. Thank you, Your Honor. The statements taken by the agents for Mr. Corley that were initiated nine and a half and 26 and a half hours after his arrest should have been suppressed because they were taken outside the six-hour safe harbor contained in Section 3501C. The question for us here is, and obviously there are circuits going various ways. It's Eric. I'm sorry. It's not Abe. Yeah. The question for us here is, which way do we go? If we go the Second Circuit, the Ninth Circuit, and the D.C. Circuit way, you're in pretty good shape, perhaps. But if all you're looking to is voluntariness and a host of circuits go that way, and it appears that our circuit goes that way as well, you've got a real issue because I don't think there's much doubt that these confessions, these waivers that he gave, both on the evening at about 5.07 and the next morning when he came back in around 10.30, they look like they're voluntary. If voluntariness is it, then there's a problem. And the case you have to deal with is Garreau, don't you? Yes, Your Honor. Your Honor has correctly identified that issue. Right now, I would add one circuit to the list of circuits that rules as the Second, the Ninth, the D.C., also the Seventh Circuit. But it does recognize that unreasonable delay can be a basis by itself. The other thing I would point out is that the cases that rule the other way, like Garreau, have not done so in a context where you have delay for the purpose of extracting the confession. Would you like to state your legal proposition first? Judge Ambrose just jumped you in and we didn't give you time to do a baseline. So why don't you start your argument? Well, the baseline is the delay in this case was unreasonable because it was for the purpose of extracting the confession, and that's per se unreasonable under 5A and McNabb-Mallory. And then second, which is Judge Ambrose's question, that unreasonable delay is grounds alone to suppress the statement. And the reason, and I think Judge Ambrose, you're correct, we do have to confront Garreau. I think an error characterized that holding in Garreau in my reply brief as dictum. It's not dictum. I think as I look back at it, the government has not really relied on Garreau. I don't think it's pressing that argument, but this court would need to reach that issue. And I think the court really has two options in doing so. If the court agrees that the more correct reading of 3501C is the one that we urge, which is that unreasonable delay is an independent ground, which is clearly what Congress intended and it's the plain wording of the statute. If this court agrees, the court really has two options. I think the court can limit Garreau to its facts, which did not involve purposeful delay, and which is also true in the other circuits which have ruled that way. Or this panel could recommend to the court en banc to reconsider Garreau. Our en bancs are disasters. Well, then I'll go with the first option, Your Honor. That's the perpetual dissenter. Well, Holmes was a dissenter. He was good. Well, I mean, this is an issue that's ripe for review. The Supreme Court in Alvarez-Sanchez, Justice Ginsburg in particular, noted we have a split in the circuits on this issue, but we're not going to decide this today. We now have circuits about four to four, and it's an issue that's ripe for the court, and I think this court does want to be on the correct side of that split, and if you construe Section 3501C, you have to conclude that unreasonable delay is an independent ground. Did the district court make a decision as to whether the delay was unreasonable? It did not. It did not reach that issue, and the reason for that was that the court erroneously, and the government agrees that this was erroneous, erroneously concluded that the statement was taken within the safe harbor, so it did not reach the reasonableness of the delay. Now, that is erroneous because the medical treatment, while it can be considered as to whether the delay was reasonable, is not taken out of the safe harbor. The 3501C is very clear that there's no basis to exclude that time period from the safe harbor, so what that leaves us is that the safe harbor expired. Maybe we ought to stop you right there, because that's the difference between the government and you as to whether the stopping and the medical delay gets deducted or doesn't get deducted from the safe harbor time. It does not get deducted, and if we take a look, and this is where the timeline might help a little bit, there's no dispute as to the times that are contained here. The arrest happens, the federal arrest happens at 8 o'clock in the morning. It's also undisputed that the city... If the arrest was, by the way, if the arrest was at 8 o'clock, why is it that it's 1145? Yeah, I have that question too. Why is it... We have no idea, Your Honor. We have no idea. That's not in the record. One of the things that's striking... Obviously, there was a significant scuffle because the guy ended up in the hospital. Well, no, he had a minor cut... He couldn't go to the hospital to Jeff until 12-12. My response would be there was clearly no medical emergency or he would have been there much sooner, and actually, Officer Turner's testimony was that it was a minor cut and that he was fine. So what I think is striking about this record is we have no indication anywhere that the agents were anything but completely indifferent to their Rule 5 obligation. There's no testimony anywhere that they are trying to get this person to a magistrate. And, in fact, the easiest part of the day to focus on in terms of the reasonableness question, if we're looking at reasonable delay, is at 3.30. At 3.30, we know that the safe harbor has now been expired for an hour and a half. The agents arrive at the federal building, and as your honors know, that's just one hallway next door to where we're sitting here today, in the court building where the magistrates sit. There is no... The agents make a conscious decision at that point in time to prepare him for a confession, not to take him to a federal magistrate. For two hours, almost, they are prepping him for a confession. Now, that in itself doesn't make it either unreasonable or unconstitutional, does it? It makes it unreasonable. Yes, it does. Well, wait a minute. Isn't it clear that even in the Supreme Court cases, they can use, let's say, the safe harbor time to try to get a confession? Yes, but this is no longer safe harbor time. Okay, but if it were safe harbor time, is there anything unconstitutional about agents trying to get a confession from a defendant? No, I would say no. If you are within the safe harbor... What Congress did in 3501C is they were responding to McNabb-Mallory, which was a prophylactic rule that the Supreme Court made for all lower courts that when you have unreasonable delay under Rule 5, we, the federal courts, are not going to accept those confessions into evidence. Congress responded, and Congress had a couple of choices when it was responding, and the choices are debated. One is to do away with the prophylactic rule in McNabb-Mallory entirely and say delay will never be a basis to exclude. Unreasonable delay. Unreasonable delay, yes, Your Honor. Will never be a basis to exclude. The other option, which is what they chose, was to carve out a period during which unreasonable delay would not be a basis, and that's the option they chose, and that's the six-hour safe harbor. So the agents, they can have booked the defendant and be all ready in an hour and be right next door to the magistrate, and that delay can be unreasonable, but Congress said no, we're going to give the agents... And they actually even looked at a three-hour rule. The one that they chose was the six-hour rule, gave latitude. I would submit to agents in interrogating defendants during those six hours before taking the defendant to a magistrate, but once there's a bright line then at the six-hour mark, and that six-hour mark on our record is 2 o'clock, which is not disputed on appeal, then the question is, delay after that point, is it unreasonable? And here, where there's no evidence anywhere that the agents were even attempting to comply with their duty to take the defendant to a magistrate, and, in fact, the record is the opposite. They wanted to get a confession before they took him to a magistrate. That is, per se, unreasonable delay. And then we confront the question of, do we exclude it on that independent ground and the issue that Joe Jambo raised? So what I'm saying is, assume for the moment that the delay is unreasonable as can be. Yes. Yes. And the trouble that I have is that you've got language in Jarreau that says Section 3501 makes admissibility of confessions dependent on their voluntariness. Delay in a defendant's presentment to a magistrate is only one factor relevant to voluntariness. And it seems pretty clear that the amending of McNabb-Mallory by the Omnibus Crime Bill of 68 is interpreted by this Court not in line with the D.C. Second, Ninth Circuits, and conceivably the Seventh Circuit. And absent going in vague, I don't know how you get around Jarreau. You said you could confine Jarreau to its facts. How could you do that? Well, if you look at what was happening in Jarreau, it was an unusual case factually. There was a mass murder. Eight people were murdered at a golf course  We are well aware of that. And so there was a massive, massive law enforcement mobilization to respond and to find the suspects in that case. There were five suspects. And most of the confessions in that case... One of them ultimately took a... walked out of jail, took a... I don't know if you know this, took an airplane and went to Cuba. I did not know that, Your Honor. Uh-huh. Labib. Go ahead. And so most of the confessions from the defendants, including Jarreau, were taken within six hours. So there's actually the... It's that second confession. And then Jarreau gave a confession the following day. And so the court, and this is why I agree, it's not dictum, it is a holding. The court did conclude that that confession the following day is admissible. But this court could choose to... to limit the holding in Jarreau to a situation in which the delay is not purposeful. Now, I think the better... more consistent with the meaning of the statute would be for the court to take it on bond and to... because the analysis, and this is difficult for me to say because of the respect in which I hold the author of that opinion. We all do, yeah. Yeah, and... Might you run a second? Yes, and he was mine for a year when I was working for him as well. Oh, you did too? Yeah, so... You did stay in Wilmington? This is not easy for me to say. You did stay in Wilmington? I'll be darned. Okay. So the problem with the... Now, there are a couple problems with the Jarreau analysis. One is that it leaves 3501C out of the statute. If voluntariness is the only test, there is no reason for a six-hour safe harbor. Also, the purpose for the delay, which is what Rule 5 and McNabb-Mallory are about, would never be even a factor because 3501B simply says the length of the delay. Now, there's another interesting point, and this is made by the district court in the Virgin Islands case in Superville. There's another... There's actually a constitutional problem with Judge Seitz's ruling in Jarreau, which is that Judge Seitz, to try to reconcile and read together A and C of 3501, said, okay, A makes a unitary test of voluntariness. C modifies that by saying, okay, in A, length of the delay is a factor in voluntariness. And C, what we're going to do is to read C as a modification of that to say, well, you're not... You can't consider the length of the delay in voluntariness during the six-hour safe harbor. Now, that is, I grant, a possible attempt to reconcile, but it doesn't really... It's not consistent with the statute and what Congress intended, but also the Congress cannot amend the constitutional voluntariness test, which is a totality of circumstances test. So if you're going to read 3501C as simply a modification, that would be an unconstitutional modification of the voluntariness test, which is reflected in A. But the main problem with the Jarreau reasoning is that it's inconsistent with what Congress wrote and with what Congress intended. To read it as this court did is to say that Congress eradicated McNamara, that they never wrote a six-hour safe harbor. They can't do that. And that's not what Congress did. Well, they can't. It was a constitutional... They were constitutional decisions, weren't they? Your Honor, I'm not sure that they were. Certainly not in the same way that Miranda was and the Dickerson court discusses, I think, their larger process underpinnings. But McNamara is... It's a rule adopted. It's a prophylactic rule adopted by the Supreme Court, but it's binding on the lower courts, except to the extent that it has been undone by Congress, and it's only been undone for six hours. Let me ask you a question. Some of the cases seem to say that if you start a confession before the six hours, then you can go on. Now, in Jarreau, the person whose confession we're really concerned about gave a confession during the six hours. Isn't that right? Yes, he did. And what was the... Do you know? What was the effect of the second confession, which was outside the six-hour time? I don't remember any discussion in the opinion as to a relationship. And we do have a different situation here. I mean, what we know from the record in our case is that at 5.27, the agents began to interrogate Mr. Corley about two things, about the assault and about the robbery. And that's in the record, that he was questioned about both of those. And that confession goes on for an hour and 11 minutes. And my argument would be that, one, the entire statement is outside the safe harbor, and unreasonably so. Well, couldn't you argue to the contrary that a confession that begins within the six hours hangs over? No, I would argue that at the time at which the agent's obligation under 5A is triggered, that's what the agents have to do. They need to get that person to a magistrate. Because what McNabb-Mallory says, and this court is bound by McNabb-Mallory, is that the agents cannot use their investigative purposes to avoid their obligation to take a defendant to the magistrate. And so my answer to Your Honor would be, no, they need to stop what they're doing. Now, in this situation, the safe harbor had expired hours before. So there's... How could we say that it's reasonable at 3.30 or at 5.27 for the agents to say to themselves, oh, we're going to decide not to take him to a magistrate. We're going to get a confession instead. How consistent with 5A could that be a reasonable decision? It simply can't be in the cases under 5A McNabb-Mallory and the cases that we've cited in the briefs. That's per se unreasonable. And that's why we would ask this court to reverse the suppression at this level. To reverse or to remand so that the district court can make a finding on reasonableness? I would say not, Your Honor. And the reason for that is the facts are not disputed. The facts were fully brought out at the hearing. Both sides had the opportunity to bring out any facts that they wanted to on the issue of the delay. So the record is fully developed. And then... So there would be no reason to remand for facts. The reasonableness determination, it's our position, is a conclusion of law and is fully ripe for this court. Because it's our position that there's no... There's no way to read this record consistent with reasonable delay. That's why my answer to Your Honor's question would be that there would be no point. Because even if the district court said, well, I think it was reasonable for the agents to not take him to a magistrate, this court would then have to reverse. That would not be a permissible conclusion. And that would be plenary review. Okay, we'll give you one more bottle.  Good morning. May it please the court. My name is Kenya Mann. I'm here for the appellee, the government. And I'd like to start with the safe harbor argument since that's the argument that the appellate has started on this morning and the court is focused on. I have a question to ask you. Yes. Your brief suggests that... by discussing the fact that the magistrates hold arraignments at 1.30 in the afternoon suggests that that's when the magistrates hold arraignments. Do you accept the fact that they hold arraignments whenever they're asked to? Yes, Your Honor, they do. I've been here for almost 28 years. And I can say from personal knowledge if they wanted a magistrate, they would get a magistrate at any time, including 3 in the morning, as Judge Ambrose says, so that it's irrelevant for this purpose. And I don't know why you stress that in your brief that they hold arraignments at 1.30. These agents could have gotten Mr. Bailey, Mr. Corley, to a magistrate as soon as they left the hospital. What I'd like to explain to the court is the court seems to have some question about what happened between 8 a.m. and 11.45 in the time that Mr. Corley gets to the hospital. No, Ms. Hay has a question, but go ahead. Actually, I do, too. I do, too. What I'd like to direct the court's attention to is pages 41 through 63 of the exhibit. And Agent Turner on directing cross spends a lot of time talking about what happened when Mr. Corley was arrested. It wasn't that he received just minor sutures, a minor injury to his hand. Five sutures, excuse me. There was a 9-year-old girl that was held up as a shield. There was an accidental discharge. There was a chase through a ravine. There was a lot the agents had to do that morning before transporting Mr. Corley down to the hospital. In other words, if he was arrested, what was he apprehended?  At 8 o'clock? At 8 o'clock in the morning. So all of that stuff would have occurred before? No, all that... The way the testimony is bared out, and if you look at the exhibit, he was arrested at 8 o'clock. That's when the agents physically took custody of him through the chase when they arrested him. It didn't happen before then. Once he was arrested, they had to secure the little group. Please stay near the mic or push the mic down because we get you on tape. Okay. I apologize. What happens is that when the agents approach his car, it's at 8 a.m., and all those series of things happen. The chase didn't happen for an hour. I would not stand here and say that. But there was a chase through a ravine, and there was an accidental discharge by the FBI. This is after he was arrested? Yes. And how long did all this last? Well, I can't tell the court exactly what time, but by the time everything was secured, if you look at the record, it's clear. It was very chaotic there. Where? You said 41 to 63. 41 to 63. This is not of the appendix, right? Of the appendix, yes. Well, I'm on 41 of the appendix. And that's Agent Turner's testimony, which bears out what happened that morning. He tells in very great detail that the little girl, the 9-year-old girl, was held up as a shield. There was a chase. They at some point thought Mr. Corley had a gun when they told him to surrender, and he did not. How could they arrest him until they had him in custody? And I said, albeit, they're chasing him. They approach his car at approximately 8 a.m., and then they chase him and arrest him, and this little girl is involved. There's an accidental discharge. That's his daughter. Excuse me? His daughter. Yes, his daughter. Do you understand? Okay. At 8 o'clock, they stop his car. They see him come out of his house, and they stop his car. They try to get him out of the car. And then how long is it that he's trying to avoid arrest before they really have him completely in custody? By viewing the testimony, Your Honor, I can only surmise it's minutes. It's certainly not hours. It's not one hour. So then we've still got 3 hours and 45 minutes. So let's say maybe if it's minutes, subtract 15 minutes, we've got what happened for 3 hours and 30 minutes or 3 hours and 15 minutes? Taking the entire situation, finding somewhere for this 9-year-old girl. There's an accidental discharge. When did they get him to the station? They got him to Sharon Hill Station somewhere around 11.45 a.m. And so my question is, and I didn't see it answered in the appendix, what transpired after they went through all of this stuff relating to really getting their hands on him, disarming him, getting him away from using the daughter as a shield, etc.? What happened? Your Honor, what I suspect happened by reading the transcript is that it took minutes to chase him and to get the little girl. But I think with the accidental discharge and finding a place for the little girl, that's why they don't get to Sharon Hill Police Station until 11.45 a.m. No, that's not what your timeline says. Your timeline says 11.45. You leave Sharon Hill, not you get to Sharon Hill. And I stand corrected on that. That's the appellant's timeline, but they leave Sharon Hill at 11.45 a.m. So they get there at some point, and then they transport him to Philadelphia. But if we all agree that 8 o'clock's the time, and it doesn't appear that there's anything in 3501C other than transportation or one other matter that can toll the time, it looks like by 2 o'clock you're supposed to get into a magistrate. Well, the government's position with respect to this is that although we are outside the safe harbor rule, the delay was reasonable. It was reasonable and necessary based on what had happened out there that morning. Well, when they got him downtown here, why didn't they take him to the magistrate? I mean, obviously the only reason they didn't take him to the magistrate is they wanted to get a confession from him. Your Honor, I don't think the record bears that out. The government would disagree with that. Didn't one of the government people say that we held him to get a confession? No, I don't believe that that was the testimony. I believe a state trooper, his name escapes me, he said he would have liked to get a statement. But there's no evidence, not one shred of evidence in that entire record that indicates that the agents or the investigators purposely detained the defendant to get a statement. Congress encourages law enforcement officers to do their job. And it encourages the fact that they would obtain voluntary statements. There's nothing, actually, there's nothing in the appellant's brief to indicate that they would even claim that this statement is not voluntary. But the point is, can voluntariness, assuming for the moment that Jarreau doesn't exist, why wouldn't our rule, if Jarreau didn't exist, why wouldn't it be what the Ninth Circuit did? Or what, D.C. Circuit or Second Circuit? I apologize, I don't understand your question. In other words, it's... Their argument is that you've got 3501A, B, and C. If A, which talks about voluntariness, is it, why don't you just stop there? Why did they do a C when they talk about a safe harbor for delay? And why is there a C at all? Because it appears that certain cases, and one could argue Jarreau does it as well, reads out the delay factor, and everything comes down to voluntariness, everything. Well, I think they foresaw that things may not be able to happen in six hours, and that's why 3501B, submissible confessions, depended on their voluntariness. But the delay in a defendant's presentment to the magistrate is just one factor that needs to be considered. It's not the end-all and be-all. It's just one factor. And Jarreau actually is critical to... But Ms. Hayes' point is that if you are holding someone, when you can almost literally just about walk across the hall and go to a magistrate, and you're holding someone beyond the six hours, and it looks as if the primary purpose for what you're doing is simply to, lack of a better word, beat on this person. Not really beat on him, but badger this person until he gives a confession. Why can't that be taken into account, even though the confession later is voluntary? Well, because I think in this situation you have to look at the entire situation. This was the first real time the investigators and the agents had an opportunity to do what they do, and that is to obtain a statement. They didn't try to obtain a statement when he was at Sharon Hill Police Department. They didn't even try to obtain a statement when he was at the hospital. We don't know that, do we? We don't know what they said to him there. The record is silent as to whether there was a statement. So we can't say that they didn't try to obtain a statement. The point is that we don't know whether they tried to obtain a statement. There's testimony in the record that the defendant in this case was laughing with the officers at the hospital. The officers fed him when he got to the FBI office. This was the first real calm time. There was an accidental discharge. There was a 9-year-old girl involved. Wait a minute. You keep talking about the 9-year-old girl. When was the 9-year-old girl moved into some safe place? She was involved during the arrest. She was the passenger when her father was arrested. The arrest started at 8 o'clock. Do we know when she was out of the picture? The record is silent as to that. Then you can't tell us, as a matter of fact, that some of this time was taken to ensure her safety. We don't know whether at 8.30 they found some place to put her. We can't assume that from your statement is all I'm saying. What I would like to direct the court's attention to is the fact that Agent Turner says this little girl was thrown on top of him so that Mr. Corley couldn't escape. At what time? It doesn't say what time. All I'm saying is that the record doesn't show us. We can't make assumptions. Is it really relevant? The government believes it is relevant because it takes into consideration what... But if you agree that the time of arrest was 8 o'clock, then you've got six hours. Maybe you subtract a few minutes here from what you're... Okay, so it's 2.15. The six hours is over. I'd like to go back to the Jerome case, which I think is closely on point to the facts in Mr. Corley's case. The court said in that case that defendants were not... Jerome is how you look at it, clearly how you analyze the delay in the context of a voluntary confession. But the point here is we're still at the point of trying just to get the facts. Are you now saying or are you trying to still make an argument that the hospital time should be told? The government's position is that we are outside the safe harbor, and although the district court... Okay, so you believe you're outside the safe harbor. We're outside the safe harbor. What's the purpose, then, for keeping the person and not taking him to the magistrate? How long could they keep him? Could they keep him just overnight? Could they just go through the night until he gets a confession? No, Your Honor, I don't believe that's the case. But I think there's factors in this situation that make it reasonable. And although the court correctly stated that I can't tell you what time these things specifically happened, knowing that these things did happen, I think the court should take them into consideration. And the district court here said that he didn't believe that Congress determined that the officer should have to determine whether someone gets medical treatment or whether they give a statement. And I believe that's the case. Now, the district court sort of carved out some time for the medical treatment here. The government would concede we're outside the safe harbor the entire time based on the fact that there was this child involved, there was an accidental discharge... You know, you keep mentioning the child, and I keep asking you. We don't know any... We don't have facts as to when the child... I mean, it's very nice that there's a great argument, but we don't know any facts. And it may be that we have to remand so the district court can put these people back on the stand and find out how much time, if that's relevant. That's what Judge Ambrose said is... But you've conceded you're outside the time, so I don't know that that's relevant. So I'm not sure where your argument is taking you. Because I think we're disagreeing on different things. I understand I'm not able to tell this court what time that little girl was saved. Okay, then don't keep mentioning the little girl. But the reason why the government does mention it is because it's one of the things that happened during the arrest, just like the accidental discharge. Yeah, but you've conceded you're outside. Yeah, we're outside. Whether it's 2 o'clock or 2.15, we're outside. We're outside. Okay, now, while we're outside, let me ask you a question. He said he didn't want to sign the statement. He wanted to go home and go back and sleep or something. Why should that be determinative? Why wouldn't the officers have had an obligation to say, that's fine, we understand that you... If the purpose was not to get the statement signed, then why shouldn't the officers have said, we have an obligation to get you to a magistrate as soon as we can because the purpose of going to a magistrate is to have the magistrate tell the defendant what his rights are. And maybe the defendant would have said, no, I'm not listening to the magistrate, I don't want to sign this. Where does it say that once he says, I'm tired, I don't want to sign it now, that the officers have to allow that to spend a lot of time... I mean, why should we accept that? Well, I think that the proper... The actual language that Mr. Corley uses, I'm tired, can I do this tomorrow? That's right. Well, why... Officers say, no, we're sorry, but we can do it as soon as we get you to a magistrate because the magistrate is for your benefit. So why should we not say that whatever else happened at 6.38 or whenever he said, I'm sorry, I'm tired, they didn't have an obligation then to get him to a magistrate at the earliest possible time after that? Actually, there's a case, and I can't put my hand on it right now, and I apologize, where it's not in the Third Circuit, but there's another defendant who also asked for a respite and says, can we come back tomorrow? And the court said that was fine. And I understand the court's question. If it's not the Supreme Court or if it's not a Third Circuit case, it doesn't mean much to us. Well, I understand that, but I think... But I'd like to know your answer. My answer is that... The purpose is to get somebody to a magistrate who will tell the defendant what his rights are. That's the whole point, right, of the requirement to get before a magistrate. Now, since it's for the defendant, and there's no indication that they said to him, look, we understand that you're tired, but for your benefit, we want to get you to a magistrate. I don't know why that wasn't said to, Mr. Corley. I don't know that... I know the agents have an obligation to take him to a magistrate. That's right. I don't know that they had an obligation to tell him... But they didn't take him to a magistrate, and if that was their obligation, they didn't do it then. They certainly didn't do it until after they got their confession. But there's no indication that there was a purposeful delay. Well... The agent said, and I don't want to interrupt, but the agent asked the question on cross-examination, did you want to obtain a statement? And he said yes. And there's nothing wrong with... Well, that's... Please, sir, when they have a protocol that you take somebody to a magistrate and they know that they are outside the six-hour window, or likely outside the six-hour window, don't... It's got to be purposeful that they're not taking him to the magistrate. I don't know necessarily, it may not be in the record, what the reason is, although we can speculate as to what it is, but it's got to be purposeful. I think that's a leap, Your Honor, and I... No leap. He's right across the hall. I mean, this is not like you had to go across town. Or like in some cities, you know, miles and miles away. At the point they're spending hours up at the Sharon Hill Police Department and hours at the hospital... Well, by that time they leave Sharon Hill at 11.45. We've still got two hours and 15 or two hours and a half, depending on your point of view, to get him to a magistrate. Why didn't they... After they came from the hospital, from Jeff, which is just right up the street here, why didn't they just bring him to the magistrate then and then start talking to him? Agents and investigators have an obligation. It's part of the investigative duties to obtain a statement. They also have an obligation taking before a magistrate. Yes, they do, Your Honor. But what I think happened here is that there was a whole series of things that had gone on, and this was the first real calm moment they had to obtain a statement. Calm moment or calm hours? Calm moment to talk to the defendant at that time, and that's what they did. And I think Jarreau bears that out because one of the things Jarreau bears out is that the defendants were not questioned. This defendant was not questioned for a long period of time, the first day or the second day. He was given food and drink, and he indicated he was tired, and he was allowed to sleep overnight before coming back. Well, wait a minute. He indicated he was tired only after they had started to question him and after he had given them an oral statement, and they wanted him to write it down so that they didn't... It isn't that they gave him food and drink and said, We're not going to question him. We're going to question you tomorrow. I mean, they started to question him. But Jarreau is directly on point here too because he asked for some time to sleep overnight, and the agents gave him that, and they did not say to him, You can be taken before a magistrate for your own good. They didn't say that to him in Jarreau either. Well, they don't have to say that to him, but they do have to take him to a magistrate. Absolutely. What we're concerned about, and what we have to be concerned about, is what the federal officers know that this court thinks is their obligation. I mean, that's really what this is about, and it's about more than just this case. And I realize that, but if you look at the facts in Jarreau, they directly point to the quality because Jarreau indicated he was tired. He was allowed to sleep overnight, and he came back the next day. And there's no indication that the record is silent in Jarreau whether the agents said to him. Jarreau was a very different situation. The island was aflame after these people were killed. We know a little bit about what was going on there. That's not this case. Nobody was killed. You didn't have more than one. These guys went onto the golf course and shot it up. So I'm not sure that the circumstances here are the same as Jarreau. We have to deal with it. But you haven't answered Judge Amber's question or mine. Mine is, it says the oral confession began at 5.27, right? That's correct, yes. Okay, so that is accepted. So at 5.27, he starts to talk. Now, at 6, so he talks for an hour. That's correct. And then he says, and they say, he must have said enough for them to say, we assign it now. There wasn't any more, I guess, questioning, we can assume. And he says, well, he's tired. Well, he's tired. And there's no indication that notwithstanding his being tired, they didn't take him to a magistrate. But the facts in Jarreau are exactly the same, and the court found that the statement was admissible. Jarreau says the same thing, and I understand the court is saying there was a homicide in Jarreau. Homicides. Homicides. And it's a bank robbery. But the rules are still the same, and the case law is directly on point with respect to Jarreau. He says he's tired, he was allowed to sleep overnight, and the questioning began the next day. That's directly on point with what happened here in Corley. Yeah, the questioning began the next day. Did they take him to a magistrate in the morning before the next day? I don't believe they did. I'm not 100%. You're talking about Jarreau? I'm talking about here. No, here was the afternoon. It was the afternoon at 130 Magistrate Court. Yeah, well, wait a minute. That goes back to my question. Once he gets up in the morning, and he says he's tired, he slept, don't they have an obligation to take him right away to a magistrate? Mr. Corley was invited. They have an obligation to present him to a magistrate. I'm never going to disagree with that. Mr. Corley was Mirandized a second time that morning. Yeah, but what does that have to do with the obligation to take him to a magistrate? When he gets up, he's no longer tired. What time did they get the statement signed? The second statement? Well, the statement signed. He only signed one statement, right? That's correct. When was that? It was somewhere in the morning. It was before 11 o'clock, if I'm not mistaken. I don't have the exact same time, and I don't want to disagree. What's the matter with taking him to a magistrate at 7.30 or 8 o'clock in the morning? I don't think there was anything wrong with taking him to a magistrate. The question is, did they have an obligation to take him to a magistrate once he has slept overnight? I believe they had an obligation to take him to a magistrate. However, I think Mr. Corley is Mirandized at that point, and he agrees to give a statement. I think that's proper, too. Are you saying that the obligation to take somebody to a magistrate is nullified by a Miranda hearing? No, I'm not saying that. Then I don't understand your response. I'm saying that the agents had an obligation to take him before a magistrate, absolutely. I think what you're saying is that voluntariness trumps everything and wipes away all sins. Or that the safe harbor is a guideline. I'll take either one of those. Do you have any more questions? No. Thank you. Thank you. Ms. Mann suggested that there might be something wrong with your timeline. Is that right? Your Honor, the timeline is based on undisputed facts in the record. I think what Ms. Mann was referring to, as I understood her argument, was that there were things that were going on that morning. But what's not in the record is what those things were and when they happened. And so it may be, I don't know, that there were things that the agents, that the officers, were doing that morning, other than just sitting and not taking Mr. Corley to a magistrate. But we don't know what it was. When did they arrive at Sharon Hill? Do we know that? It's not in the record. What we know is that they left at about 11.45. So as Judge Amber pointed out, we have 3 hours and 45 minutes, approximately, when we don't know exactly what was happening. What we know is that they were not interrogating Mr. Corley and we also know that they were not making any attempt to take him to a magistrate. We also know that he was not severely wounded. Now, I would like to respond to one of the arguments that Ms. Mann made. If we look at page 105 of the record, Ms. Mann said that we don't have evidence that what they were doing was avoiding taking him to a magistrate. The FBI agent was asked directly. Oh, we'll find it. 105 in the appendix? Yes. Okay. And it's at the top. I'll get the bottom, yeah. FBI agent Heaney was asked, The reason that Mr. Corley was not brought before a magistrate on the morning of 9-18-03 and that he was brought to the FBI was the FBI's desire and when I say FBI, I'm talking about you and Agent Roselli's desire to question Mr. Corley concerning the events of a bank robbery that he was being investigated for. Isn't that true? And the answer is yes. Now, when the government called its witnesses at the hearing, it did not call Agent Roselli who was present at the confession on Wednesday the 17th. Agent Heaney was not there on the 17th. But Trooper D'Angelo, who was working with the federal agents, similarly testified as to the 17th that you didn't take him to a magistrate, right, and that was because you wanted to get a confession. So that's in the record. The government, and this was an issue that was being litigated. The government did not elicit any testimony from any witness that there was some other reason that the agents were delaying. And so that's clearly borne out in the record. And I find the government's argument interesting. The government seems to be construing the rules and the statute to guarantee the agents an opportunity to get a confession before they take a defendant to a magistrate, and that simply is not the law. Well, it's not the law that they can't do that. I mean, it's not the law that if it's a reasonable amount of time that they can't use the time that they have. Absolutely, absolutely. Okay, so you concede that it's perfectly all right to keep somebody certainly within the safe harbor to try to get a confession. Within the safe harbor. The question that what I understand the government to be arguing is that once you're outside the safe harbor, the agent's investigative duty to get a confession is a reason, a reasonable reason, to delay taking the person to a magistrate. And that's opposite of the law. Exactly opposite of what the Supreme Court said in Mallory and what the cases have said since then. What Congress did in 3501C was to give agents a liberal time period during which to get a confession and not try to take the defendant to a magistrate. But outside the safe harbor, there have to be legitimate reasons. And if you look at the advisory committee notes to 5A, reasonable delay refers to reasons that the agents cannot get. She hasn't talked for five minutes. Three, three. No, keep on going. So there's no way, I mean, the cases are clear that if the reason you're delaying is to get the confession and you're outside the safe harbor. Now, there was a question. You haven't picked on the point that I raised, and I'm surprised at that, the fact that they didn't take him to a magistrate as soon as he woke up in the morning. No, Your Honor's correct. That was equally unreasonable. I didn't see it in your brief. Well, we were focusing on the first day because if it's unreasonable then, by law, it's unreasonable the second day. And I would like to respond to one of the questions that Your Honor raised in the discussions with Ms. Mann. Ms. Mann's response was that, well, since he asked for this, then it was okay to do that. My answer to that would be the rights in Rule 5A, like Miranda rights, are waivable. In other words, and what agents sometimes do is they will say to a defendant, look, we need to take you to a magistrate, but we would like to talk to you or we would like you to make it controlled by or something. Would you like to waive your right to a prompt appearance in front of the magistrate? And defendants sometimes do waive those rights and those might be litigated. That is not the scenario that we have here. We do not have a defendant who was asked, well, okay, well, if you want to talk with us tomorrow morning, we need you to waive your right to a prompt appearance. That did not happen. And that is my response to Your Honor's question on that point. Okay, thank you. Thank you, Your Honor. Judge Antler has suggested, and I think it's a good idea, that we would like a transcript of this argument. We get the disks, but they're now on disks. But the issue in this case, for both of you, is a significant one, certainly the most significant one we've had this sitting, I think, and it goes much farther than this case. So I think the government has so much money to send abroad that it can probably pay for the transcript. The defendant's office is dependent on our budget. So, Ms. Mann, could you arrange to have a transcript made of this argument? And also, I would ask you, because sometimes whoever's transcribing it is not familiar with the terminology that you use, would you read the transcript, both of you, before you okay it to be sent to the court so that we know we don't have any garbled language in the transcript? And get it to us as soon as you can, okay? But I'm not putting a time limit on that. It would be helpful. You both made very good arguments, and we want to have the time to think about them. Thank you both. Thank you, Your Honor. Thank you both for your arguments. We'll take the matter under advisement. Okay.